[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR TEMPORARY INJUNCTION
This action comes before the court on the plaintiff's motion for a temporary injunction. For the reasons stated below, the plaintiff's motion is granted.
 I. FACTS AND PROCEDURAL HISTORY
The following facts are derived from the pleadings, documents submitted in connection with the motion and testimony heard at oral argument on January 8, 2001. The plaintiff, the Carvel Corporation (Carvel), is in the business of, inter alia, selling retail manufacturing licenses to franchisees who operate Carvel ice cream stores throughout the United States.[1] Carvel also sells ice cream and related goods and services to franchisees to assist them in promoting and selling Carvel products to the public. The defendants, Leopold DePaola and David DePaola, operated a Carvel store located at 663 Lakewood Drive, Waterbury, Connecticut. The defendants, Leopold DePaola, David DePaola and Paul DePaola operated CT Page 5660 another Carvel store located at 2190 Brass Mill Center, Waterbury, Connecticut.[2]
On November 1, 1990, Leopold and David DePaola entered into a Carvel retail manufacturer's license agreement for the Carvel franchise store #1578 (the Lakewood agreement) and a signs and special equipment lease. The term of the Lakewood agreement was ten years, expiring on October 31, 2000. On March 22, 1991, Leopold and David DePaola entered into a trade secrets agreement. Thereafter, on September 11, 1997, the defendants entered into a Carvel retail manufacturer's license agreement for the Carvel franchise store #2704 (the Brass Mill agreement). The term of the Brass Mill agreement was to run from September 11, 1997 until January 31, 2008. Contemporaneous to executing the Brass Mill agreement, the defendants entered into a branch unit rider (the rider), a special equipment lease and a trade secrets agreement. The rider was a financial incentive that Carvel provides to franchisees who open more than one store. Both the Lakewood and Brass Mill agreements contained covenants not to compete, which expressly prohibited the defendants from operating an ice cream store within two miles of their previous franchise location for three years after the abandonment or expiration of the respective license agreement. Furthermore, under the agreements, the parties resolved that performance or breach of the agreements would be interpreted, governed and construed pursuant to New York law.
On or about June 15, 2000, Carvel contacted the defendants regarding a renewal of the Lakewood agreement for an additional five years. The defendants indicated that they intended to renew and were in negotiation with their landlord to extend the store lease. In response thereto, Carvel undertook a refurbishment inspection of the Lakewood premises in July of 2000. In September of 2000, Carvel sent a letter to the defendants regarding the renewal to which the defendants never responded.
On October 31, 2000, the Lakewood agreement expired by its terms and Carvel contends that, despite the lack of a license agreement, the defendants have continued to operate an independent ice cream store at the Lakewood location. In addition, Carvel claims that on November 13, 2000, it learned that the defendants had also begun operating the Brass Mill store as an independent ice cream store and had ceased operating it as a Carvel franchise. Consequently, on November 16, 2000, Carvel filed the underlying seven count verified complaint. The first, third and fourth counts of the verified complaint allege various breach of contract violations against the defendants pursuant to the respective license agreements. The second and fifth counts allege violations of the respective covenants not to compete. The sixth count alleges trademark infringement pursuant to General Statutes § 35-11I. The seventh count CT Page 5661 alleges misappropriation of trade secrets pursuant to General Statutes § 35-50, et seq.
Together with the verified complaint, Carvel filed the present motion for temporary injunction. The motion prays for equitable relief on three grounds. First, Carvel seeks an order requiring the defendants "to cease using and to return any and all Carvel Standard Operating Procedure Manual(s) and all other Carvel signs, identification and point of sale materials bearing the `Carvel' name or any other Carvel trademarks, trade secrets, display items, signs or property." (Motion for Temporary Injunction, November 16, 2000, p. 1.) Second, Carvel seeks an order requiring the defendants to cease operating an independent ice cream store at the Lakewood location pursuant to the covenant not to compete contained in paragraph thirty-one of the Lakewood agreement. Finally, Carvel seeks to have the Brass Mill store closed pursuant to the covenant not to compete contained in paragraph thirty-one of the Brass Mill agreement.
The parties stipulated to Carvel's first temporary injunction request and the defendants agreed to return all of Carvel's trademarked property listed in the request. However, the defendants have challenged Carvel's second and third requests regarding the closing of the defendants' independent ice cream stores at the Lakewood and Brass Mill locations pursuant to the respective covenants not to compete. The court has reviewed all the pleadings submitted by the parties in connection with the motion for temporary injunction and now issues this memorandum of decision.
 II. DISCUSSION
"The principal purpose of a temporary injunction is to preserve the status quo until the rights of the parties can be finally determined after a hearing on the merits." Rustici v. Malloy, 60 Conn. App. 47, 56,758 A.2d 424, cert. denied, 254 Conn. 952, 762 A.2d 903 (2000); see alsoOlcott v. Pendleton, 128 Conn. 292, 295, 22 A.2d 633 (1941). "The issuance of an injunction is the exercise of an extraordinary power which rests within the sound discretion of the court." Silitschanu v.Groesbeck, 208 Conn. 312, 318, 543 A.2d 737 (1988). "An injunction is a harsh remedy and our courts have consistently held that its issuance is only proper in order to prevent irreparable injury." Buckner v.Shorehaven Golf Club, Inc., 13 Conn. App. 503, 504, 537 A.2d 532 (1988). "It is clear that the power of equity to grant injunctive relief may be exercised only under demanding circumstances." Anderson v. Latimer PointManagement Corporation, 208 Conn. 256, 262, 545 A.2d 525 (1988).
To obtain a temporary injunction, the moving party must show: a CT Page 5662 likelihood of success on the merits; an imminent, substantial and irreparable injury; a lack of an adequate remedy at law; and that a balancing of the equities favors the granting of the injunction. SeeGriffin Hospital v. Commission on Hospitals and Health Care, 196 Conn. 451,457-58, 493 A.2d 229 (1985); see also Infinex Investments, Inc. v. Dise, Superior Court, judicial district of Danbury, Docket No. 340674 (December 12, 2000, Hiller, J.).
 A. Likelihood of Success On the Merits
In the present case, the likelihood of success on the merits will turn largely on the court's interpretation of the covenant not to compete and its resolution of the defendants' affirmative defenses. Carvel seeks the present temporary injunction because the defendants allegedly have and continue to operate independent ice cream stores at Lakewood Drive in Waterbury, Connecticut, and in the Brass Mill Center in Waterbury, Connecticut, in violation of the covenants not to compete contained in the Lakewood agreement and Brass Mill agreement respectively. In response the defendants raise two affirmative defenses. First, the defendants contend that at present they are under no obligation to operate either the Lakewood or Brass Mill locations as Carvel franchisees. They claim that the Lakewood agreement expired by its terms on October 31, 2000, and pursuant to the rider, which the defendants contend is the only operative instrument governing the Brass Mill store, the Brass Mill license was terminated contemporaneously. Second, the defendants argue that Carvel had already breached the agreements between the parties by violating the covenant of good faith and fair dealing by establishing a supermarket program to sell Carvel products and, inter alia, by short filling bags of ingredients from their suppliers.
 1. Covenant Not To Compete
Carvel alleges that the defendants have and continue to breach their license agreements for both the Lakewood and Brass Mill stores in that they continue to operate independent ice cream stores at both locations after the expiration and termination of the respective agreements. The agreements contain covenants which state in relevant part "it is agreed . . . that in the event Licensee sells the Carvel Store or abandons the Carvel Store provided for in this Agreement, or in the event this Agreement expires, or is terminated for any reason except for Carvel's breach, then for a period of three (3) years next following such event Licensee shall not directly or indirectly engage in whole or in part in the production, distribution or sale of ice cream or other frozen desserts whether as a proprietor, employee, officer, director, agent, joint venturer, partner or other capacity whatsoever, at the location of the within Carvel Store or, within a radius of two (2) miles of the site CT Page 5663 of the within Carvel Store."
"Under New York law, the enforceability of a restrictive covenant depends in part upon the nature of the underlying contract." DAR Associates, Inc. v. Uniforce Services, Inc., 37 F. Sup.2d 192, 196
(E.D.N.Y. 1999). Covenants made as part of ordinary commercial contracts, such as license agreements are to be analyzed "under a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract." Id., 197. The following factors have been considered in analyzing the rule of reason: whether the plaintiff has demonstrated a legitimate business interest that warrants the enforcement of the restrictive covenants; the reasonableness of the covenants with respect to geographic scope and temporal duration; and the degree of hardship that enforcing these covenants would inflict upon the defendants, bearing in mind the degree to which they consciously agreed to bear the risk of such hardship when they entered into the agreements. See id.
First, the court will address whether Carvel has demonstrated a legitimate business interest that warrants the enforcement of the covenant not to compete. Carvel alleges that the defendants are using the training and know how they obtained as Carvel franchisees, as well as Carvel's trademarks, reputation and goodwill, to operate competing and virtually identical ice cream stores at both the Lakewood and Brass Mill locations. The defendants argue, however, that Carvel has no `protectable' interest and may not prevent them from operating an ice cream store at the same location. In support of their argument the defendants cite Carvel v. Bryfogle, Supreme Court, state of New York, county of Westchester, Docket No. 14153/87 (August 25, 1987, Donovan,J.).
In Bryfogle, Carvel directly leased the premises in a shopping center from the landlord and entered into a license agreement with the franchisee defendant. The license agreement in Bryfogle expired on October 31, 1985, and Carvel terminated its leasehold agreement on February 1, 1986, thereby abandoning the site altogether. In early 1987, Bryfogle entered into an agreement with the landlord and began operating an independent ice cream store out of the same location. The court held that Carvel has "no choate protectable interest" when they abandon a site and, therefore, may not prevent the former franchisee from operating an ice cream store at the same location nearly a year later. Carvel v.Bryfogle, supra, Supreme Court, Docket No. 14153/87.
The defendants here argue that, as in Bryfogle, Carvel never had any right to occupy either the Lakewood or Brass Mill locations because Carvel never directly leased those premises. Thus, the defendants argue CT Page 5664 Carvel has no protectable interest in the present case. The court disagrees with the defendants. While it is true that Carvel does not exercise the same amount of physical control or leasehold interest over the premises as they did in the Bryfogle case, Carvel still has a legitimate business interest in its own goodwill and name recognition established with the consumers at both the Lakewood and Brass Mill locations. Furthermore, as evidenced by the separate trade secrets and special lease agreements entered into by the defendants, Carvel's interest in maintaining its trade secrets and know how is not merely a pretext, but is a real and legitimate concern of its business. Additionally, in the present case, in the summer and fall of 2000, Carvel took affirmative steps to renew its license at the Lakewood store and thereby sought to continue a Carvel franchise at that location.[3] Moreover, by filing the present action a mere sixteen days after the expiration of the Lakewood agreement, Carvel has demonstrated a desire to maintain and preserve its business interests in both the Lakewood and Brass Mill locations. The court finds, therefore, that Carvel has demonstrated a legitimate business interest in both the Lakewood and Brass Mill locations and that said interest warrants enforcement of the covenant not to compete.
Second, the court considers the reasonableness of the covenants with respect to geographic scope and temporal duration. The Carvel covenant not to compete requires the defendants to refrain from "directly or indirectly engag[ing] in whole or in part in the production, distribution or sale of ice cream or other frozen desserts" for a period of three years after the termination or expiration of the license agreements and within a two mile radius of the current store location. (See Carvel Manufacturer's License No. 005770 [Brass Mill Agreement], Joint Exhibit 3, September 11, 1997, p. 17, ¶ 21.)
"The reasonableness of these provisions is informed by the circumstances and context in which [Carvel] seeks to enforce them." DAR Associates, Inc. v. Uniforce Services, Inc., supra, 37 F. Sup.2d 199. The stated rationale for the covenants not to compete is "to prevent dilution of the exclusivity of the valuable Carvel know-how and Carvel trade secrets." (See Brass Mill Agreement, p. 17, ¶ 21.) Notably, these covenants were negotiated by sophisticated business people — the defendants have been in the ice cream business since at least 1990 and Carvel has approximately 390 franchise stores nationally. Furthermore, the reasonableness of the Carvel covenant not to compete with respect to geographic scope and temporal duration has been upheld by several New York courts. See Carvel Corp v. Eisenberg, supra,692 F. Sup. 185 (holding that the Carvel boilerplate language used in its covenant not to compete was unambiguous and consistent with the stated purpose); see also Carvel Corp. v. Rait, 117 App.Div.2d 485, 491, CT Page 5665503 N.Y.S.2d 406 (N.Y.App.Div. 1986) (same). Accordingly, the court finds that the restrictions contained in the covenants are reasonably related to protecting Carvel's business interests and are sufficiently limited in duration and geographic scope.
Finally, the court will address the degree of hardship that enforcing these covenants would inflict upon the defendants. The defendants claim that by enforcing these covenants, they will lose both their income and their investment in the Lakewood and Brass Mill stores. The defendants further claim that these hardships would be immediate, devastating and irreparable.
The defendants do not allege that they were coerced into entering either transaction or that they lacked any meaningful choice when they signed the agreements. Moreover, there is no evidence that the covenants not to compete were anything other than negotiated provisions in exchange for which the defendants received valuable consideration. Any hardship that the defendants face, therefore, is mitigated by the fact that the defendants, with their eyes wide open, specifically agreed to bear the risk of that hardship. The defendants received the benefit of their bargain by their use of the Carvel trade name, proprietary information and good will over the course of the last ten years. The defendants should not now be allowed to deprive Carvel of a central benefit of its bargain by using what they gained from Carvel to compete directly against Carvel in the same market and at the same location.
After balancing the competing public policies in favor of robust competition and freedom to contract, the court finds that (1) Carvel has demonstrated a legitimate business interest that justifies the enforcement of the restrictive covenants; (2) the covenants are reasonable with respect to geographic scope and temporal duration; and (3) the hardship that enforcing these covenants would inflict upon these defendants is ameliorated by the defendants' informed acceptance of such an outcome when they entered into their agreements with Carvel. The covenants not to compete in the Lakewood and Brass Mill agreements are, therefore, enforceable as a matter of law.
2. Operative Agreements
The defendants argue that they managed the Brass Mill store solely under the terms of the rider. They claim that the rider was the sole and complete agreement between the parties with regard to the Brass Mill location. The defendants contend that the rider contains an integration clause[4] that states that the rider "contains all of the terms, conditions, covenants and conditions agreed to by the parties." (Memorandum of Law in Opposition to Motion for Temporary Injunction, CT Page 5666 January 22, 2001, p. 4.) Additionally, the defendants argue that, pursuant to paragraph six of the rider, any license agreement for the Brass Mill store automatically terminated upon the natural expiration of the Lakewood agreement. Therefore, as a result of the alleged proper expiration of the Lakewood agreement and resulting termination of the Brass Mill agreement, the defendants contend that they are free to operate independent ice cream stores at these locations as they see fit.
Under New York law, the intent of the parties is determined, where possible, by the plain language of the contract. See Mallard ConstructionCorp. v. County Federal Savings Loan Assn., 32 N.Y.2d 285, 291,298 N.E.2d 96, 344 N.Y.S.2d 925 (1973). "In interpreting a contract `the court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.' Atwater Co. v. Panama R. Co., 246 N.Y. 519,524, 159 N.E. 418, 55 A.L.R. 982 (1927)." Carvel Corp. v. Eisenberg,692 F. Sup. 182, 184 (S.D.N.Y. 1988). "[A] court should not `adopt an interpretation' which will operate to leave a `provision of a contract without force and effect.' . . . Stated differently, our concern is with the intent of the parties `to the extent that they evidenced what they intended by what they wrote' . . . and that intent must be gleaned from the several provisions of the contract." Laba v. Carey, 29 N.Y.2d 302,308, 277 N.E.2d 641, 327 N.Y.S.2d 613 (1971).
"It is the court's responsibility to determine if the language of the contract is ambiguous. If it is not, extrinsic evidence is inadmissible to explain or vary the terms of the agreement." Mallard ConstructionCorp. v. County Federal Savings Loan Assn., supra, 291. "If there is ambiguity in the terminology used, however, and determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such determination is to be made by the jury (Restatement, 2d, Contracts, T. D. No. 5, 238). On the other hand, if the equivocality must be resolved wholly without reference to extrinsic evidence the issue is to be determined as a question of law for the court." Hartford Accident Indemnity Co. v. Wesolowski, 33 N.Y.2d 169,172, 305 N.E.2d 907, 350 N.Y.S.2d 895 (1973).
In the present case, despite the arguments put forth by the defendants, the court finds that the Brass Mill agreement and the rider were intended to be one agreement ("License No. 005770") governing the licensing rights and obligations of the parties with respect to the Brass Mill store. The court further finds that no ambiguities exist with respect to the language in License No. 005770. The Brass Mill agreement CT Page 5667 and the rider were executed on the same day, September 11, 1997. It was only after the plaintiffs filed a breach of contract claim that the defendants now contend that the Brass Mill agreement, which they knowingly signed as experienced franchisees, is null and void. It is illogical that the defendants executed an agreement that they believed to be null and void at the time of its execution. The court finds therefore, that on September 11, 1997, the parties intended that both the Brass Mill agreement and the rider be read together.
Furthermore, the plain language of the Brass Mill agreement and the rider indicates that the parties intended the two documents to work together to make up License No. 005770. The integration clause in both the Brass Mill agreement and the rider reference "other agreements specifically contemplated hereby." Additionally, both the Brass Mill agreement and the rider have identical headings which include: "License No. 005770, Branch No. 2704 and Location: 2190 Brass Mill Center, Waterbury, CT 06705." Accordingly, the court finds that the Brass Mill agreement and the rider are specifically intended to be read as one agreement, or as "other agreements specifically contemplated", but certainly not as separate and distinct binding agreements.
In conclusion, the court rejects the defendants first affirmative defense and finds that the Lakewood agreement, the Brass Mill agreement and the rider are all operative agreements between the parties.[5]
3. Covenant of Good Faith And Fair Dealing and Other Alleged Breaches
The court now considers the factual defenses interposed by the defendants. The defendants claim Carvel's own breaches of the agreements render the covenants not to compete unenforceable. In support of this claim the defendants point to the plain language of the agreements which indicate that the covenants not to compete shall be enforceable "except [in the event of] Carvel's breach." The defendants claim that when Carvel established its supermarket program, it breached the duty of good faith and fair dealing implicit in the agreements and tortiously interfered with the defendants' prospective business relations. In addition, the defendants claim that Carvel supplied the defendants with short-filled bags of powdered ice cream mix and overcharged the defendants for one inspection. The defendants claim that these breaches rendered the covenants not to compete void.
On the issues of Carvel's breach of the duty of good faith and fair dealing and/or tortious interference, the defendants' rely on the trial court's ruling in Baker v. Carvel Corp., No. 94 CV 1882 (D.Conn. filed August 9, 1999). Baker was an action for damages brought by a number of Carvel franchisees against Carvel alleging, inter alia, breach of the CT Page 5668 implied covenant of good faith and fair dealing and tortious interference with business relations. Carvel sought judgment as a matter of law against one of the plaintiffs, Peter Marsella. The court in Baker
concluded, however, that the licensing agreement between the parties was sufficiently ambiguous to allow a jury to decide whether establishment of the supermarket program within .25 miles of Marsella's franchise constituted a breach of the duty of good faith and fair dealing and/or tortiously interfered with Marsella's business.
Thereafter, on July 16, 1999, the jury decided that Carvel's implementation of the supermarket program did not breach Carvel's franchise agreement with Marsella. (See Memorandum of Law In Opposition To Motion For Temporary Injunction, Exhibit 5, Baker v. Carvel Verdict Form and Special Interrogatories.) The jury went on to decide that Carvel had, however, breached the agreement by selling Carvel products within .25 miles of Marsella's franchise. Id. Thereafter the jury decided on unspecified grounds that Carvel had tortiously interfered with Marsella's prospective business relations. Id.
The unmistakable implication from the jury's decision is that Carvel's implementation of the supermarket program, without more, did not constitute a breach of its franchise agreement with Marsella and that Carvel breached the agreement solely by selling its products within .25 miles of Marsella's franchise. Notably, the jury did not indicate whether Carvel's sales in supermarkets or in other Carvel stores within .25 miles of Marsella formed the factual predicate for its decision.[6]
In the present case, the defendants claim that Carvel's institution of the supermarket program violated the covenant of good faith and fair dealing implicit in the agreements. First, as the defendants concede in their brief, the Baker decision does not collaterally estop this issue. Second there is no evidence in the present case that Carvel established a supermarket program within .25 miles of either of the defendants' stores.[7] Third, it is not clear whether the jury in Baker found against Carvel on the basis of its sales in supermarkets within .25 miles or its sales in a competing Carvel store within .25 miles.[8] Thus the defendants' reliance on Baker is misplaced and, therefore, there is insufficient evidence to support a finding that Carvel breached the covenant of good faith and fair dealing merely by their establishment of the supermarket program.
On the issue of tortious interference the jury in Baker was not asked to delineate the factual basis for its decision. Nonetheless, in light of the jury's responses to the other interrogatories, it is reasonable to assume that the decision on tortious interference was also based on Carvel's sales of its products within .25 miles of Marsella's CT Page 5669 franchise.[9] Notably, there is absolutely no evidence that the jury's decision on the issue of tortious interference was based upon Carvel's mere establishment of its supermarket program, and this court will not enter into the realm of speculation and conclude otherwise. Since the defendants in the present case base their claim of tortious interference solely on Carvel's establishment of the supermarket program, Baker lends no support to their claim. Thus, there is insufficient evidence to find that Carvel tortiously interfered with their franchises.[10]
The defendants further claim that Carvel breached its agreements by short filling bags of ingredients and by overcharging on one occasion for an inspection. Under New York law, a party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract. See Frank Felix Associates, Ltd. v. Austin Drugs, Inc.,111 F.3d 284, 287 (2d. Cir., 1997). A determination of whether a breach is material depends upon a consideration of all of the relevant facts and circumstances. See id., at 289.
The defendants claim that in 1997 they became aware that bags of ice cream mix provided by Carvel were short-filled. Thereafter, on August 1, 1997, at the defendants' request, the department of consumer protection, division of weights and measures, conducted an inspection of certain bags of mix in the defendants' inventory. According to the report submitted into evidence, the label on each of the twelve bags inspected indicated that it contained 320 fluid ounces/2.5 gallons but the inspection found an average shortage of 1.7 fluid ounces or .1225 pounds. The defendants also claim that, in derogation of the terms of the agreements, they were charged more than $100.00 for one periodic inspection by Carvel.
Carvel claims that it was unaware of the short-filling of bags by one of its two suppliers. Carvel further maintains that, upon being made aware of this problem, it notified its franchisees, remedied the problem with the supplier and, in 1998, offered a financial settlement to its franchisees. Carvel further points out that the department of consumer protection report was issued one month prior to the Brass Mill agreement. Therefore, the defendants entered the Brass Mill agreement with full knowledge of the shortage problem. With respect to the disputed inspection fee, Carvel claims that the fee included travel and other expenses incurred by Carvel and permitted by the agreements.
The court finds that the defendants had full knowledge of any breach due to shortfilling no later than August 1, 1997. Nonetheless, the defendants never sought to terminate the Lakewood agreement on this basis and, in fact, on September 11, 1997, entered into a new and virtually CT Page 5670 identical agreement for the Brass Mill store. Furthermore, there is absolutely no evidence that the short-filling of the mix bags impeded or adversely affected in any way the operation of either the Lakewood or Brass Mill stores.
The court further finds that the inspections conducted by Carvel were permitted by the agreements and were ongoing throughout the ten year duration of the agreements. The defendants' claim that they were overcharged for one inspection is not supported by the evidence. Significantly, until Carvel brought this action, the defendants never complained to Carvel about either of these grievances, nor did the defendants seek to terminate the agreements.[11] Thus the court finds that Carvel's breaches, if any, were not material and that the defendants' claims to the contrary are pretexts put forth solely to avoid the defendants' obligations under the covenants not to compete. The court further finds that any breaches attributable to short-filling or to inspection fee overcharge were not so substantial as to defeat the object of the parties in making these agreements. In conclusion, the court finds that the defendants have not provided sufficient evidence to support the claimed defenses that Carvel breached the agreements between the parties and that, therefore, the covenant not to compete is unenforceable.
Having concluded that the covenant not to compete is legally enforceable and that the defendants' evidence supporting their factual defenses is insufficient, the court concludes that Carvel is likely to succeed on the merits of its claim at trial.
 B. Imminent Harm and Adequate Remedy At Law
In addition to showing a likelihood of success on the merits, Carvel must also show they will suffer irreparable harm if the injunction is not issued. "An injunction is a harsh remedy . . . and when an equitable injunction is the specific relief claimed, it is incumbent upon the party seeking relief to allege facts showing irreparable damage and the lack of an adequate remedy at law." (Citations omitted; internal quotation marks omitted.) Stoker v. Waterbury, 154 Conn. 446, 449, 226 A.2d 514 (1967). "Irreparable harm arises when there exists no legal remedy furnishing full compensation or adequate redress for a wrong done to or sustained by an individual. The injury or wrong complained of must be serious or material and not adequately reparable by damages at law in that, such damages will not restore the complaining party to the position in which the party formerly stood." Bugryn v. Bristol, Superior Ccurt, judicial district of New Britain at New Britain, Docket No. 495682 (January 31, 2000, Kremski, JTR.). "Although absolute certainty is not required, it must appear that there is a substantial probability that but for the issuance of the injunction, the party seeking it will suffer irreparable CT Page 5671 harm." Silitschanu v. Groesbeck, 12 Conn. App. 57, 65, 529 A.2d 732
(1987), aff'd, 208 Conn. 312, 543 A.2d 737 (1988).
Carvel argues that the defendants' continued operation of the ice cream stores in question will cause the plaintiff irreparable harm for two reasons. First, Carvel alleges that consumers will be misled into thinking that they are buying Carvel products when they are not. Carvel has submitted photographs showing that the appearance of the defendants' two stores is substantially the same as equivalent Carvel stores, that the posters, pictures and menu board display Carvel products and that products being sold by the defendants resemble Carvel products. Carvel alleges that the defendants' continued sales of such products from these stores will mislead consumers and damage the Carvel brand name and goodwill.
Second, Carvel argues that the defendants continued operation will severely damage the integrity of the Carvel franchise system. Carvel claims that franchisees should not be allowed to build up their businesses and customer bases by using the Carvel marketing plans and brand name then, once established, compete with Carvel. Carvel further argues that, if this practice is permitted, other successful franchisees will leave the system to compete with Carvel and the entire 400 franchise business will collapse.
The defendants concede that Carvel will suffer a loss in revenue should the injunction not be granted but argue that any loss would be insignificant considering the many Carvel products sold in nearly 400 franchises and more than 5,000 supermarkets nationally. Furthermore, the defendants maintain that "[t]he mere loss of profits is not the sort of irreparable harm which supports the issuance of a temporary injunction unless the lost profits are of such a magnitude as to threaten the viability of the business." Petereit v. S.B. Thomas, Inc., 63 F.3d 1169
(2d Cir. 1995), cert. denied, 517 U.S. 1119, 116 S.Ct. 1351,134 L.Ed.2d 520
(1996). The defendants argue that allowing them to continue to operate their ice cream stores will not threaten the viability of Carvel.
"Whether damages are to be viewed by a court at equity as irreparable or not depends more upon the nature of the right which is injuriously affected than upon the pecuniary measure of the loss suffered." (Internal quotation marks omitted.) Patry v. Board of Trustees, 190 Conn. 460,472, 461 A.2d 443 (1983). Both the loss of good will and consumer confusion can establish the irreparable injury necessary for injunctive relief. See Dunkin' Donuts, Inc. v. Dowco, Inc., No. 98 CV166, 1998 U.S. Dist. LEXIS 4526, *8 (N.D.N.Y. March 31, 1998).
Carvel claims that the products for sale in the defendants' stores are CT Page 5672 substantially similar to, if not identical to, those of Carvel. It also claims that the defendants' ice cream stores look like the old Carvel stores without the trademark signs and that the new shops are using the telephone listing of the former Carvel stores. Finally, Carvel maintains that, on at least one occasion. the defendants used Carvel's trademarked cake molds to create and market a novelty ice cream cake.
Carvel has a legitimate interest in protecting its know how, trade secrets, goodwill and the integrity of its franchise system. Thus, Carvel has a legitimate and reasonable interest in limiting the defendants' ability to operate a substantially similar, if not identical, ice cream shop offering substantially similar, if not identical, ice cream products in the same location as the former Carvel shops. Furthermore, the defendants' continued use of Carvel's proprietary information in a competing operation, without paying the franchise fees and other fees provided for by the agreements, tends to undermine the integrity of the franchise system. The court finds that Carvel has demonstrated, therefore, an actual, imminent, substantial and ongoing injury to its business. Accordingly, Carvel has established the element of irreparable harm because it has a legitimate interest in protecting its business in the Waterbury market, consumer confusion is likely, Carvel risks losing goodwill and the defendants' actions are harmful to the continued viability of the franchise system.
"`Adequate remedy at law' means a remedy vested in the complainant, to which he may, at all times, resort, at his own option, fully and freely, without let or hindrance." Stoker v. Waterbury, supra, 154 Conn. 449. "If the plaintiffs have an adequate remedy at law then they are not entitled to the injunction." Id. Carvel argues that the loss of consumer confidence and deterioration of Carvel's goodwill cannot be compensated with monetary damages, therefore, a temporary injunction is necessary. The defendants argue that Carvel has an adequate remedy at law because, should they win the litigation, any loss in profits could easily be calculated and Carvel could be made whole with an award of compensatory damages.
"While ordinarily proof of imminent irreparable harm is essential, in [a case involving a violation of a covenant not to compete] there is no such requirement. It has long been recognized in this state that a restrictive covenant is a valuable business asset which is entitled to protection. . . . Irreparable harm would invariably result from a violation of the defendant's promises. . . . The reason for this is that such a plaintiff's actual injury is not susceptible of determination to its entire extent but is estimable largely by conjecture and prediction. . . . The very nature of the defendant's conduct is such that its real impact will not be felt fully for several years in the future. In this CT Page 5673 case the defendant's competitive activities carried out within the year in question are likely to produce harmful effects in subsequent years in expanding geometric progression. As the court said in Gordocki v.Goldring Home Inspections, Inc., 6 C.S.C.R. 988 (November 18, 1991, Hodgson, J.), `while the . . . [defendant] could maintain a claim for damages as to each violation that causes injury the difficulty of proof and the inefficiency of repetitive suits render inadequate the use of successive remedies at law, and injunctive relief is therefore warranted to protect the defendant from harm which the restrictive covenant was intended to prevent." (Citations omitted.) Gartner Group, Inc. v. Mewes, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. 118332 (January 3, 1992, Mottolese, J.) (5 Conn.L.Rptr. 412).
The court finds that the defendants are selling products which are substantially similar, if not identical, to Carvel products at locations which are similar in appearance to prototypical Carvel stores. Not only is the physical layout of the stores unchanged from when they were Carvel stores, but the defendants have left in place numerous pictures and posters depicting Carvel products and provided by Carvel. Furthermore, since the termination of their relationship with Carvel, the defendants have used Carvel novelty cake molds to create one or more Carvel look-a-like ice cream cakes. These actions serve to undermine consumer confidence and deteriorate Carvel's goodwill. Moreover, the actions of the defendants will likely have an adverse effect on Carvel's ability to maintain its franchise system. Thus, the court finds that the damages suffered by Carvel consist of more than mere lost profits over the next two years and that such damages are not capable of estimation with any degree of certainty. Since the damages to Carvel are difficult, if not impossible to quantify, Carvel has no adequate remedy at law.
 C. Balancing the equities
Having concluded that Carvel has suffered irreparable harm and has no adequate remedy at law, the court must now balance the equities which militate in favor of and against the issuance of an injunction in this case.
"An injunction is an equitable remedy, and may be denied if the balance of the equities favors the defendant." Connecticut Light Power Co. v.Holson Co., 185 Conn. 436, 444, 440 A.2d 935 (1981). "In exercising its discretion, the court, in a proper case, may consider and balance the injury complained of with that which will result from interference by injunction." Tomasso Bros., Inc. v. October Twenty-Four, Inc.,230 Conn. 641, 648, 646 A.2d 133 (1994). In deciding whether injunctive relief is appropriate, the degree of irreparable harm which may result to each party must be measured and balanced. "[The] equities [of the case] CT Page 5674 should take into account the gravity and willfulness of the violation, as well as the potential harm. . . ." Haddam v. LaPointe, 42 Conn. App. 631,639, 680 A.2d 1010 (1996).
The court recognizes that the hardship to the plaintiff includes the loss of their trade secrets and know-how, the use of these trade secrets and know-how against them in a competing ice cream store, customer confusion, loss of goodwill, diminution of its presence in the Waterbury market, loss of profits, loss of franchise and other fees and the loss of the Brass Mill store as a model mall store. In contrast, the defendants claim the loss of their livelihood and their investment.
Upon balancing the equities, the court finds the equities weigh in favor of Carvel. Carvel has at all times acted in good faith and in accordance with the terms of the agreements. In the summer and fall of 2000, Carvel was ready and willing to renew the Lakewood agreement and had on several occasions taken affirmative steps in pursuit thereof. At the hearing, Carvel testified that it remains willing to continue the defendants as franchisees. As noted above, the defendants' operation of identical competing stores in the former Carvel locations are causing and will continue to cause Carvel to suffer a loss of proprietary information, customer confusion, loss of goodwill, loss of profit and other monetary remuneration and a diminution of the integrity of the franchise system.
While the court sympathizes with the concerns of the defendants, any hardship enuring to them is of their own making. The defendants were aware of the covenants not to compete and chose to ignore them willfully and at their own peril. Further, the loss claimed by the defendants is speculative and unproven, while the loss to Carvel is immediate, ongoing and irreparable. Additionally, the loss to the defendants may be ameliorated by their return to the Carvel franchise system. Thus, the damage to Carvel is, without question, greatly disproportionate to that of the defendants and, therefore, the balancing of the equities justifies granting injunctive relief in favor of Carvel.
 III. CONCLUSION
For the foregoing reasons, the plaintiff's motion for temporary injunction filed on November 16, 2000, is hereby granted. It is hereby ORDERED:
A. The defendants, Leopold DePaola, David DePaola and Paul DePaola, are hereby enjoined from using and hereby ordered to return any and all Carvel standard operating procedure manual(s) in their possession and all Carvel signs, identification and point of sale materials bearing the CT Page 5675 "Carvel" name or any other Carvel trademarks, trade secrets, display items, signs or property.
B. The defendants, Leopold DePaola and David DePaola, are hereby restrained from directly or indirectly engaging in whole or in part in the production, distribution or sale of ice cream or other frozen desserts at the location of their former Carvel Store #1578 on Lakewood Drive in Waterbury, Connecticut or within two miles until October 31, 2003 or until further order of the court, whichever occurs earlier.
C. The defendants, Leopold DePaola, David DePaola and Paul DePaola, are hereby restrained from directly or indirectly engaging in whole or in part in the production, distribution or sale of ice cream or other frozen desserts at the location of their former Carvel Store #2704 at Brass Mill Center in Waterbury, Connecticut or within two miles thereof until October 31, 2003 or until further order of the court, whichever occurs earlier.
BY THE COURT,
PATRICIA A. SWORDS, JUDGE OF THE SUPERIOR COURT